STATE

v.

Russell **DUCHARME.**

No. 90–474–C.A.

Supreme Court of Rhode Island.

Dec. 19, 1991.

James E. O'Neil, Atty. Gen., Aaron Weisman, Sp. Asst. Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

John J. Nugent, Jr., Ronald J. Resmini, Ltd., Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment entered in the Superior Court wherein the defendant was convicted of thirty-two charges, including seven counts of conspiracy to commit murder, eight counts of assault with intent to commit murder, seven counts of conspiracy to enter a dwelling house with intent to

commit larceny, seven counts of entering a dwelling house with intent to commit larceny, two counts of first degree arson, and one count of malicious mischief. We vacate the convictions and remand for a new trial. The facts underlying these judgments of conviction insofar as pertinent to the appeal are as follows.

Russell Ducharme (Ducharme) and Peter Trepanier (Trepanier), who was tried separately, were accused of carrying out what might be termed a reign of terror in northern Rhode Island arising out of a series of shooting incidents which occurred between December 8, 1986, and January 8, 1987, in the towns of North Smithfield and Cumberland and the city of Woonsocket. Ducharme and his confederate were also accused of a number of charges of breaking and entering with intent to commit larceny and three incidents of arson which took place between April 28 and June 24, 1987.

Although there had been extensive police investigation of all these incidents, along with participation by the National Guard, the perpetrators of these offenses had not been apprehended nor had suspects been identified, until events which took place on October 7, 1987, led to a confession by Trepanier made first to a close friend, Paula Laliberte (Laliberte), and later on the early morning of October 8, to Patrolman Walter Warot and Lieutenant Michael E. Richardson at the Woonsocket police station.

During Trepanier's discussion with Laliberte, he disclosed that he had been the perpetrator of the shooting incidents as well as the breaking-and-entering incidents and that he had been aided and assisted in these criminal ventures by Ducharme. Laliberte later disclosed to members of the State Police and other officers that Ducharme had been Trepanier's confederate. As a result of this disclosure on Thursday, October 8, 1987, Detectives John Leyden and Greg Long of the Rhode Island State Police apprehended Ducharme when he returned from work. They placed him under arrest and drove him to State Police headquarters in North Scituate for questioning. During the ride, defendant was admonished concerning his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Upon arrival at the North Scituate barracks, Ducharme was turned over to Detectives Brian Andrews and William Eckert for further investigation. Ducharme asked the officers why he had been arrested. In response Detective Andrews advised Ducharme of his *Miranda* rights, reading from a card which he had in his wallet. Andrews then advised Ducharme that he was a suspect in a series of sniping incidents. Ducharme then inquired whether the police had any other suspect in custody. Andrews replied that they did have another individual whose identity he could not disclose. Andrews then asked Ducharme if he would cooperate with the police in attempting to further their investigation. Ducharme's reply was to inquire whether he might gain some advantage if he did cooperate. Andrews responded that although no promises could be made, the fact of Ducharme's cooperation would be made known to the proper authorities. Ducharme considered the matter for a few minutes and then declared "I'm glad it's over."

Detective Bowie was called into Sergeant Andrews' office for the purpose of presenting Ducharme with a waiver of rights form. The form was presented to Ducharme who signed the form in the presence of Detectives Andrews, Eckert and Bowie who witnessed the document.

After the execution of the waiver form which took place at approximately 8:30 p.m., the officers discussed the facts of the case with Ducharme in a debriefing colloquy for about one hour. Thereafter, Ducharme gave a confession which was audiotaped. The taping took place from about 9:30 p.m. until 1 a.m. As part of his taped confession, Ducharme again acknowledged that his confession was voluntarily and knowingly given.

Later that same morning Ducharme gave two additional taped confessions, one to the Glocester police chief and the second to a detective from the town of Burrillville. In each incident the taped confession was given after defendant was admonished con-

cerning his *Miranda* rights and after he had explicitly waived those rights.

All three taped confessions described in detail Ducharme's participation along with Trepanier in a number of sniping incidents and a series of breaking-and-entering and arson incidents that occurred over the period beginning December 8, 1986, and ending in June 1987.

The taped confessions given to the State Police, the Glocester police chief, and the Burrillville detective were all admitted and played before the trial justice and jury at trial.

In addition to the taped confessions a number of victims of the shooting incidents and the breaking-and-entering incidents testified at the trial. In addition to this testimony two notes to which Ducharme had adverted during his taped confession were produced by witnesses who had discovered one note directly below the automatic banking machine at a branch of the Eastland Bank and another note which had been left on an automobile. Both notes purported by their contents to have been written by the sniper or snipers. As a result of this and other evidence, Ducharme was convicted of thirty-two of sixty counts contained in the indictment and was found not guilty in six of the counts. Certain charges did not relate to Ducharme, and others were dismissed by the state or by the court. The trial justice sentenced Ducharme to serve a total of 115 years in the Adult Correctional institutions to be followed by two concurrent life sentences which were imposed consecutively to the 115-year sentence.

In support of his appeal defendant raises eight issues. These issues will be considered in the order in which they have been raised in Ducharme's brief.

# I

## THE MOTION TO SUPPRESS DUCHARME'S CONFESSIONS

■ Ducharme argues that the three confessions which he made to the State Police and representatives of the Glocester and Burrillville police should have been suppressed. His principal argument appears to be that since Trepanier's confessions to the State Police were suppressed by reason of the fact that they had been elicited after Trepanier asserted his right to counsel, consequently Ducharme's confessions should be suppressed as the fruit of the poisoned tree. We must reject this argument mainly on the ground that Ducharme does not have standing to object to a violation of Trepanier's Fifth Amendment right, even though the violation of that right may have been instrumental in producing evidence which ultimately may have been prejudicial to Ducharme.

It is in the Fourth Amendment area that the doctrine of standing has most frequently been explicated by the Supreme Court of the United States in a series of cases including *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Court has been explicit and emphatic in declaring the principle that one may complain only when his or her Fourth Amendment rights have been violated and may not seek the suppression of evidence on the ground that such evidence was produced through the violation of the Fourth Amendment rights of another, even though those violations may have been egregious as in *United States v. Payner, supra.*

The same principle has been enunciated in respect to the assertion of a violation of a right arising under the Fifth Amendment in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The Court observed that it has held repeatedly that the Fifth Amendment is limited to prohibiting the use of physical or moral compulsion exerted on the person who asserts the privilege and, therefore, by implication does not include compulsion which may be asserted upon someone else (such as an attorney who might be required to respond to a subpoena regarding information voluntarily placed in his possession by

a taxpayer). Earlier in *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), the Court held that the Fifth Amendment rights of a taxpayer were not violated by the enforcement of a documentary summons directed to her accountant and requiring production of the taxpayer's own records in the possession of the accountant. The Court so held with the observation:

"It is important to reiterate that the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to information that may incriminate him. As Mr. Justice Holmes put it: 'A party is privileged from producing the evidence but not from its production.' *Johnson v. United States*, 228 U.S. 457, 458 [33 S.Ct. 572, 572, 57 L.Ed. 919] (1913). The Constitution explicitly prohibits compelling an accused to bear witness 'against himself': it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege, and 'prohibition of compelling a man * * * to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him,' *Holt v. United States*, 218 U.S. 245, 252–253 [31 S.Ct. 2, 6, 54 L.Ed. 1021] (1910) (emphasis added). It is extortion of information from the accused himself that offends our sense of justice." 409 U.S. at 328, 93 S.Ct. at 616, 34 L.Ed.2d at 554.

It cannot be made more clear that this personal privilege may be asserted only by the individual whose Fifth Amendment right has itself been violated. One may not complain about compulsion that may be applied to another, even though that application may result in the production of evidence that may be used against a defendant.

Hence, Ducharme may only rely on violations committed against him personally in advancing a claim of protection under the Fifth Amendment. After examining the record, we agree with the finding of the pretrial justice that Ducharme was properly given his rights, understood them, and voluntarily, intelligently, and knowingly waived those rights in making his statements to the police without threats, promises, or coercion of any type.

It is evident from the record that the police were scrupulous in advising Ducharme of his constitutional rights and that the he waived those rights knowingly and without compulsion. Accordingly we conclude that Ducharme's Fifth Amendment rights were not violated by the police in the course of taking his statements.

■ The defendant advances a different but related argument that his statements to the police ought to be considered inadmissible. He suggests that the police only became aware of his identity as a result of statements made by Trepanier that were subsequently suppressed. He contends that the evidence which supported the probable cause leading to his arrest was derived from an invalid confession made by Trepanier. Based upon this argument he asserts that the statements made by him while detained by the police should be held inadmissible as the product of a warrantless arrest implemented without probable cause. We disagree and reiterate that Ducharme lacks standing to object to statements by Trepanier identifying defendant that are part of a confession later suppressed. *See Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

Even assuming, *arguendo*, that defendant did have such standing, we disagree with his characterization of the facts of this case. The pretrial justice found that the police first learned of Ducharme's identity from a source independent of Trepanier's suppressed statements—Paula Laliberte. After reviewing the records, we agree with the pretrial justice's findings.

Just after midnight, on October 8, 1987, Trepanier told Laliberte of his involvement in a number of the snipings, housebreaks, and arsons in the course of a one-hour conversation in the parking lot of the Woonsocket Motor Inn. Trepanier told Laliberte that he and Ducharme committed all

the crimes together. After divulging this information to Laliberte, a distraught Trepanier decided to turn himself in, and he did so at the Woonsocket police station. At about 3:30 p.m. on the eighth, in his final statement to the police, Trepanier first named Ducharme as his coparticipant in the crimes. All Trepanier's transcribed confessions were later suppressed as violative of his Fifth Amendment rights. However, the pretrial justice found that Laliberte informed the police, at about 5:20 a.m. on the eighth, that Trepanier told her that Ducharme was involved in all of the crimes. Hence, the police knew of defendant's identity some ten hours before Trepanier's identification of Ducharme. Laliberte was clearly an independent source—indeed the original source—of the police's knowledge that Ducharme might be involved with Trepanier in the snipings and other crimes.

 The exclusionary rule, which includes within its scope certain evidence derived from illegal police activity, does not apply when the government learns of evidence from a source independent of the original violation. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Hence, even if Ducharme had standing to raise the sufficiency of Trepanier's identification of his coparticipant, his arrest was based on evidence untainted by any unconstitutional conduct. Laliberte's statements alone were of sufficient detail to provide the police with probable cause to arrest defendant without a warrant. She correctly identified the location of items taken from some of the breaking and enterings and recovered from Trepanier's parents' residence on the morning of the eighth. Probable cause to arrest a suspect without a warrant exists if "at the time of the arrest, the arresting officer had knowledge of facts and circumstances, based on reasonable and trustworthy information, sufficient to cause a prudent officer to believe that the suspect had committed * * * a crime." *State v. Brennan*, 526 A.2d 483, 485 (R.I.1987). The information that Laliberte provided the police clearly afforded them sufficient cause to arrest defendant. Taken with Trepanier's statements and photographic identification that implicated Ducharme, which defendant lacks standing to challenge, we readily agree with the pretrial justice that the police had probable cause to arrest defendant.

We conclude that the trial justice did not err in declining to suppress defendant's three taped confessions.

## II

### THE MOTIONS IN LIMINE

Ducharme argues that the trial justice erred in granting two motions in limine. The defendant suggests correctly that the two motions were related. One sought preclusion of any evidence concerning the suppression by the pretrial justice of Trepanier's confessions. The second motion sought preclusion of any evidence concerning or alluding to the fact that Trepanier had been burned by a stungun or similar weapon while in State Police custody on October 8, 1987.

We have already pointed out that as a matter of constitutional law, Ducharme had no standing to complain of a violation of Trepanier's Fifth Amendment privilege against self-incrimination.

 We recognize that under the humane doctrine, a Rhode Island defendant is privileged to attack the voluntariness of his confession in his presentation to the jury as well as in his challenge to the admissibility of such confessions or admissions on a legal basis before a trial justice or a pretrial justice. *State v. Killay*, 430 A.2d 418 (R.I.1981); *State v. Boswell*, 73 R.I. 358, 56 A.2d 196 (1947).

 Nevertheless, in presiding over the trial of a case, the trial justice must determine as a matter of law those evidentiary elements which are admissible in challenging the voluntariness of a defendant's confession or admission. A trial justice's determination on the issue of relevance is reviewed by us only for an abuse of discretion. *State v. Bibee*, 559 A.2d 618, 620

(R.I.1989). In determining the issue of relevancy, the trial justice certainly did not abuse his discretion in precluding the advancing to the jury of a legal theory which had already been rejected by a pretrial justice. Although the jury has a right to determine voluntariness, it may do so only on the basis of facts which could as a matter of law affect voluntariness. In short, even an egregious violation of Trepanier's privilege against self-incrimination could not be utilized by Ducharme in respect to the voluntariness of his confession.

Consequently the trial justice did not commit an abuse of discretion in granting the two challenged motions in limine.

## III

### THE JOINDER OF COUNTS

■ Ducharme argues as did Trepanier that the pretrial justice erred in denying his motion for severing the counts in the indictment referring to the sniping incidents which took place between December 1986 and January 1987 from counts which related to charges of breaking and entering with accompanying charges of malicious mischief, larceny, and arson.

In *State v. Trepanier*, 600 A.2d 1311 (R.I.1991), we pointed out that under Rule 8(a) of the Superior Court Rules of Criminal Procedure, joinder of offenses may be permitted in the same indictment if the offenses charged are of the same or similar character or if based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. *See State v. Lassor*, 555 A.2d 339, 345 (R.I.1989). We further held that the sniping or assault charges were not of the same or similar character as the housebreaking or arson charges. We further held that these two types of criminal actions did not disclose any common scheme or plan.

We further noted that in seeking a severance, defendant was not relying upon a discretionary determination pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure as in *State v. Whitman*, 431 A.2d 1229 (R.I.1981), but was seeking severance as a matter of right. If joinder was not authorized under Rule 8(a), there is no room for discretion and the rule must be applied in accordance with its terms.

Therefore, for the reasons outlined in *State v. Trepanier*, Ducharme's challenge to the joinder of these counts must be sustained.

## IV

### THE JUROR

The defendant contends that the trial justice erred in declining to excuse a juror who defendant argues was biased. In light of the fact that a new trial will be ordered in respect to all charges, because of the joinder issue, it is unnecessary and inappropriate to consider this claim.

## V

### THE HANDWRITTEN NOTES

■ The defendant asserts that the trial justice erred in admitting into evidence two handwritten notes which were found under an automobile windshield wiper and in an automatic-bank-teller machine in Slatersville, Rhode Island. Both notes purported to have been written by the sniper or snipers. It should be noted that during defendant's taped statement to the Rhode Island State Police, he said that he and Trepanier had left a note on a car to "let people probably just think it's cranks." The defendant also stated that Trepanier left a note about the sniping incidents in a bank.

At trial the prosecution presented two witnesses who testified they found anonymous notes. One witness testified that on January 12, 1987, he discovered a note under his automobile windshield wiper. The witness further testified that the note contained information about the sniping incidents and directed the finder to contact local officials. He did so by contacting the North Smithfield police, who in turn collected the note from him. At trial the witness identified the note as the one he found on his car on January 12, 1987. A second witness testified that on the morning of

January 14, 1987, he found an unsigned note on a bank transaction envelope containing the words "[T]he sniper was here" in an automatic-bank-teller machine in Slatersville. The witness also testified that he immediately gave the note to the Smithfield police.

Given the contents of and the circumstances under which both notes were found, the trial justice could have found that it was "reasonably probable" pursuant to 901(a) of the Rhode Island Rules of Evidence that the evidence was what the prosecution purported it to be: the notes defendant had referred to in his taped statement. The first note contained information about the sniping incidents and it was found on an automobile, as defendant had recounted to the Rhode Island State Police. Further, at trial, a handwriting expert testified, pursuant to Rule 901(b)(3), that the handwriting belonged to Trepanier. The trial justice did not abuse his discretion by admitting this evidence. Although its content was minimal, the circumstances under which the second note was found made it "reasonably probable" that the note was the one defendant stated he had left on the car. The note was found on January 14, 1987, one week after the then-latest outbreak of sniping incidents. Moreover, the fact that the second note was found two days after the first and more specific note was discovered could have supported an inference on the part of the trial justice that this second note had been referred to by defendant in his statement to the police.

■ Defense counsel's argument rests on the faulty assumption that in order for the documents to be authenticated under Rule 901, the handwriting in the documents must be attributed to defendant. Rule 901 is more flexible than defense counsel would contend. In order to authenticate the evidence, the prosecution only needed to show that the documents were notes containing information and found in the locations indicated by defendant's statements to the Rhode Island State Police. Defense counsel seems to ask for a "missing link" when he points to the fact that the witnesses could not identify the handwriting as defendant's. Defense counsel's argument, however, overlooks the fact that defendant himself provided the link in his own testimony. As the trial justice indicated, he found sufficient connection between the witnesses' testimony and defendant's statement. It is the jury's function to decide the weight to give to the evidence. The trial justice therefore acted within his wide breadth of discretion in finding it probable that both notes were what the prosecution claimed them to be. Certainly the trial justice did not abuse his discretion in determining that the relevance of these notes had been established.

## VI

### THE ASSERTION OF PRIVILEGE OF PETER TREPANIER

■ The defendant asserts that the trial justice committed error when he declined to compel Trepanier to testify in spite of his assertion of his privilege against self-incrimination. We respectfully disagree with this argument. It should be noted at the outset that at the time that Ducharme sought to compel Trepanier to testify as a witness, he had been found guilty of twenty-seven counts of a sixty-count indictment that had been filed against both Ducharme and Trepanier. However, it should also be noted that Trepanier at that point had not argued his motion for new trial and, of course, had not tested his conviction on appeal before this court. Although defendant argues that he wished to interrogate Trepanier about events relating to his interrogation by the police, it cannot be overlooked that events relating to the interrogation might well if expanded by cross-examination establish points which might serve as a link in a chain of events that could have incriminated Trepanier. *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

The trial justice did not err when he refused to compel Trepanier to testify in the presence of the jury. The trial justice made his determination based on the voir dire examination of Trepanier where, on advice of counsel, Trepanier invoked his

Fifth Amendment privilege against self-incrimination, thereby refusing to respond to any of the defense counsel's substantive questions. After the voir dire examination, the trial justice asked Trepanier if, before the jury, he would again invoke his Fifth Amendment privilege. Based upon Trepanier's response that he would reassert the privilege if called to testify, the trial justice precluded the defense from calling Trepanier at trial.

■■■■ The defense urges us to find that the trial justice erred by precluding Trepanier's testimony because Trepanier had waived his privilege against self-incrimination when he testified at the suppression hearing. We do not agree. It is well settled that a defendant who testifies in a suppression hearing does not waive his privilege or right to object to use of illegally obtained evidence in any other context. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The Fifth Amendment protection against self-incrimination as applied to the states in *Malloy v. Hogan, supra,* is not lost until a conviction is final. As the Supreme Court stated in *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973), the Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also [accords him the] privilege not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." For this very reason the privilege cannot be said to be extinguished until a defendant has exhausted all available routes of appeal. *See, e.g., Taylor v. Best*, 746 F.2d 220, 223 (4th Cir.1984) (citing *Lefkowitz* in dicta); *State v. Johnson*, 77 Idaho 1, 287 P.2d 425 (1955), *cert. denied*, 350 U.S. 1007, 76 S.Ct. 649, 100 L.Ed. 869 (1956). Therefore, since Trepanier's conviction was not final when he exercised his right to invoke the Fifth Amendment, the trial justice did not err when he precluded Trepanier from being called to testify before the jury.

## VII

### EXCLUSION OF EVIDENCE CONCERNING PRIOR RELATIONSHIP WITH COUNSEL

The defendant contends that the trial justice erred in excluding the testimony of several witnesses who, defendant maintains, would have testified that on June 26, 1987, he was told by Attorney Joseph Nugent, Jr., and his mother that he was not to speak with the police without first consulting counsel. Ducharme claims that this admonition resulted from an incident on June 25, 1987, in which he was questioned by the Burrillville police about a housebreaking and was subsequently released. Additionally, defendant asserts that he had an attorney-client relationship with Joseph Nugent, Jr., dating back to the June, 1987 incident and maintains that it would be relevant to whether defendant in fact requested an attorney when he was arrested on October 8, 1987. We disagree with Ducharme's contentions and conclude that the trial justice properly excluded this evidence as irrelevant.

■■■■ Under *Miranda* and its progeny, if an individual requests an attorney before questioning or during questioning, any interrogation must cease. *Miranda v. Arizona*, 384 U.S. at 473–75, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723. The right to counsel may only be asserted by the accused and the accused alone. *State v. Burbine*, 451 A.2d 22, 28 (R.I.1982). In order for the right to attach, it must follow a "clear assertion" of the right to the assistance of counsel by the accused. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981). Consequently the trial justice must determine whether the police should have understood the individual in custody to be making an unequivocal request for an attorney. The focus of the trial justice's inquiry is upon the objective comprehension of the police at the time of the supposed request. Evidence of the accused's possible state of mind on another occasion or of previous experiences with the police is not directly probative of whether the accused in fact requested counsel in a particular instance.

Under Rule 403 of the Rhode Island Rules of Evidence, a trial justice may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The standard of review of a trial justice's determination of relevance is that he or she will be reversed on appeal only for an abuse of discretion. *State v. Bibee,* 559 A.2d at 620; *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189 (R.I.1984); *Kelaghan v. Roberts,* 433 A.2d 226 (R.I.1981). We conclude that admission into evidence of what Attorney Nugent and defendant's mother supposedly told defendant three months earlier confuses the proper focus of the inquiry as to whether counsel was requested at the time of interrogation, and would be misleading to the jury. This inquiry is fixed squarely upon the accused's actual statements in response to the required *Miranda* admonitions. Consequently the trial justice committed no error in excluding such evidence.

## VIII

### THE EXCESSIVE SENTENCE

■ The defendant asserts that the sentence imposed was excessive under all the circumstances of this case. In light of the fact that this court will vacate this conviction on other grounds and remand the case for a new trial, consideration of the validity of the sentence would be inappropriate at this time. However, we should point out, as we have done in *State v. Trepanier, supra,* that this court will not, save under unusual circumstances not present in this case, consider the validity or illegality of a sentence on direct appeal. We have stated on numerous occasions that the appropriate procedure for challenging an improper or illegal sentence is to seek a revision of that sentence initially in the Superior Court pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure. In the event that a defendant is aggrieved by the decision of the Superior Court after a ruling on such motion, this court will review the determination on appeal within the limited scope allowed by our previous cases. *State v. Lee,* 502 A.2d 332 (R.I.1985); *State v. Bucci,* 430 A.2d 746 (R.I.1981).

Consequently the defendant's challenge to the severity of his sentence cannot be considered at this time.

For the reasons stated, the defendant's appeal is sustained in part and denied in part. The papers in the case may be remanded to the Superior Court for a new trial.